# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 513 | **DATE** | 7/22/2002 |
| **CASE TITLE** | USA vs. Adame-Salgado | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the Court denies defendant's motion to dismiss the indictment.

(11) ■ [For further detail see order attached to the original minute order.]

| ✓ | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | JUL 26 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | 40 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | | |
| OR | courtroom deputy's initials | 02 JUL 25 PM 4:41 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Case No. 01 CR 513 |
| | ) | |
| JUAN CARLOS ADAME-SALGADO | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Juan Carlos Adame-Salgado is charged under 8 U.S.C. §1326(a) with illegally re-entering the United States after having previously been deported as an aggravated felon. He has moved to dismiss the indictment, arguing that his due process rights were violated in connection with the deportation proceedings that form the underlying basis for the current charge. The Court held an evidentiary hearing on the motion. For the reasons set forth below, Adame-Salgado's motion to dismiss is denied.

### The deportation proceedings

On March 2, 1995, Adame-Salgado pled guilty in Illinois state court to possession of a stolen motor vehicle and received a three year prison sentence. On March 20, 1995, he pled guilty in state court to attempted murder and two counts of armed robbery and received a six year prison sentence.

On September 29, 1996, the United States Immigration and Naturalization Service served Adame-Salgado, who was in an Illinois prison, with an order to show cause why he should not be deported based on his criminal convictions, together with a notice of hearing. The deportation hearing began on January 10, 1997 and was conducted by video conference. An immigration

judge advised Adame-Salgado that he had a right to be represented by counsel at his own expense. Adame-Salgado replied that he had an attorney, Mark Kadish, but that he had not been able to reach Kadish in time for him to appear. Upon being advised that Adame-Salgado was not scheduled to be released from prison until January 1999, the judge continued the hearing to April 9, 1997 to give Adame-Salgado the opportunity to appear with counsel. He advised Adame-Salgado that "[w]e are going to go forward with your case with or without a lawyer on April the 9th." Govt. Ex. 4, pp. 3-4.

On April 9, 1997 (again by video conference), Adame-Salgado stated that he did not have counsel. Asked whether he was "prepared to speak for [him]self," he replied in the affirmative. Govt. Ex. 5, p. 6. The immigration judge described in summary form how the case would proceed. After doing so, the judge said the following:

> At the end, I'll have to enter a decision in your case. My decision will not be final, unless you accept it and the Government accepts it. Whoever does not accept it the decision may take an appeal to a higher court. The court above this court is called the Board of Immigration Appeals. If this Court were to rule against you, then you would have a right to take a further appeal to the United States Circuit Court of Appeals for the Southern [sic] Circuit, which governs the State of Illinois, we are housed, and where we are seated today.

*Id.*, p. 7. The judge proceeded to read the allegations against Adame-Salgado, obtaining his response to each allegation. The allegations included that Adame-Salgado was not a United States citizen or national (Adame-Salgado admitted this but said he was a "resident"); that he was a citizen or national of Mexico (he admitted that he was a native of Mexico but not a citizen); that he had entered the United States (he admitted this); that his "status was adjusted to an immigrant on October 25th, 1989" (he denied this); that he was convicted on March 2, 1995 for possessing a stolen motor vehicle and on March 20, 1995 for attempted first degree murder,

2

armed robbery, and aggravated battery (he admitted this); that he had been sentenced to six years in prison (he admitted this); and that the crimes did not arise from a single act (he admitted this). *Id.,* pp. 8-10. The judge then read Adame-Salgado the charges against him: that he had been convicted of two crimes involving moral turpitude not arising from a single scheme of misconduct, and that he had been convicted of an aggravated felony consisting of a crime of violence. Adams-Salgado appears to have admitted that this was so, but he denied that it was grounds for deportation. *Id.,* pp. 11-13.

The following exchange then occurred:

Q: ... Mr. Adame, if it were necessary for me to order you deported, to what country would you wish to be sent?

A: I really don't know, because I don't have no family back in Mexico. All of my family is here.

Q: All right. Is there any reason why you cannot go to Mexico?

A: Well, Your Honor, I spent most of my life here. I have gotten used to the culture, the ways of the States, and I have my family here. And I really don't see why I need to go back just because I made a mistake. It doesn't mean I have to be [indiscernible].

Q: All right. Mr. Adame, the law permits me to give you a chance to designate a country, if you wish to do so. You don't have to. Do you want to designate a country?

A: I don't, Your Honor.

*Id.,* p. 13.[1] When asked whether there was any reason he could not return to Mexico, Adame-Salgado said: "I don't know where to start and where to begin, if I was to go back. I have no – I told you my family [is] here, and if I do have family over there I don't know them. And I thought

---

[1] The hearing evidently was tape recorded, and the transcript was prepared after the fact from the recording.

I should be given another chance, or at least given –." (At this point it appears that the judge cut

off Adame-Salgado). *Id.,* p. 14.

The hearing proceeded, with the INS offering documentary evidence supporting the

allegations in the charges. *Id.,* pp. 15-20. After hearing a final plea from Adame-Salgado, the

judge found against him on both charges and ordered him deported to Mexico. *Id.,* p. 21; *see

also* Govt. Ex. 6. The judge then described Adame-Salgado's rights as follows:

> Q: If you believe my decision is not just, you may take an appeal to the Board
> of Immigration Appeals in Falls Church, Virginia, within the next three
> [sic] days, or you accept my decision and waive appeal. What do you wish
> to do?
>
> A: Your Honor, did you say how long you will deport me?
>
> Q: Pardon?
>
> A: Did you say for how long I will be deported?
>
> Q: You will have to serve your time here in the Illinois Department of
> Corrections. Once you are released from the Illinois Department of
> Corrections, you will be turned over to the Immigration Service, and then
> they will execute my order. When they will do that, I cannot tell you. ...
> Do you understand?
>
> A: Yes.
>
> Q: All right. Do you want to accept my decision, or do you want to take an
> appeal?
>
> A: Would like to take an appeal.
>
> Q: All right. You have until May 9, 1997 to file the appeal with the Board of
> Immigration Appeals in Falls Church, Virginia. The clerk will forward to
> you the appeal forms.

*Id.,* pp. 21-22. Finally, the judge explained to Adame-Salgado that he would be subject to

criminal prosecution if he re-entered the country following deportation:

4

> Q: Mr. Adame, I have to caution you. If you fail on your appeal forms, once you return to Mexico you may not return back to the United States for 20 years without special permission from the Attorney General. If you return within the 20 years without this permission, you may be subject to criminal prosecution for having reentered the United States after being deported. Do you understand?
>
> A: Yes, I do.

*Id.*, p. 23. The immigration judge did not, either at that hearing or at any other time, advise Adame-Salgado with regard to the possibility of filing an application for waiver of deportation pursuant to §212(c) of the Immigration and Nationality Act, 8 U.S.C. §1182(c).

Adame-Salgado appealed the immigration judge's order to the Board of Immigration Appeals. The BIA denied the appeal on May 14, 1998, stating that the appeal appeared untimely, but nonetheless considering the appeal on its merits. Govt. Ex. 7. The BIA concluded that the order of deportation was proper and that despite Adame-Salgado's claim of hardship, he had "neither identified nor established prima facie eligibility for any form of relief" from deportation. *Id.*, p. 2. Adame-Salgado was deported in December 1998 and at that time was again advised that he could not return to the United States without first obtaining the Attorney General's permission. Govt. Ex. 9.

### The motion to dismiss

Adame-Salgado returned to the United States despite having been warned not to do so. In May 2001, he was arrested by a local police department, and the INS was advised that he had returned to the United States. In June 2001, he was charged with a violation of 18 U.S.C. §1326(a), which makes it a crime for an alien who has been deported to re-enter the United States without the express permission of the Attorney General.

5

Adame-Salgado moved to dismiss the indictment, alleging that the deportation proceedings were tainted by various errors that denied him due process and made the proceedings fundamentally unfair, thus making the deportation an improper predicate for a prosecution under §1326(a). First, he says, the proceeding was fundamentally unfair because he did not have counsel and as a result did not understand his rights to challenge deportation either before or after the immigration judge's decision. Second, Adame-Salgado argues that he was not properly advised with regard to his right to seek judicial review of the deportation order. Third, he notes that he was not advised of his right to petition for relief from deportation under §212(c).

After extensive briefing, the Court determined to hold a hearing on the issue of whether Adame-Salgado was prejudiced by the alleged errors during the deportation proceedings. We will discuss our findings and conclusions from the hearing in the following section of this Memorandum Opinion.

**Discussion**

Until recently, §1326 did not by its own terms permit a defendant being prosecuted for re-entry following deportation to challenge the legality of the underlying deportation. In *United States v. Mendoza-Lopez,* 481 U.S. 828 (1987), however, the Supreme Court held that due process requires allowing a defendant to collaterally attack the underlying deportation order "where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review" of the deportation. *Id.* at 839. The Court relied on cases establishing that "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding." *Id.* at 837-38, citing *Estep v. United States,* 327 U.S. 114, 121-22 (1946), *Yakus v.*

*United States*, 321 U.S. 414, 444 (1944), and *McKart v. United States*, 395 U.S. 185, 196-97 (1969).

In *United States v. Espinoza-Farlo*, 34 F.3d 469 (7th Cir. 1994), the Seventh Circuit held that to successfully prevent his underlying deportation from being used to prove an element of a §1326 offense, the defendant must show both that the deportation hearing "effectively foreclosed his right to direct judicial review of the deportation order," and that the deportation hearing was fundamentally unfair, that is, that "he was prejudiced by the Immigration Judge's failure to inform him of his rights to seek a suspension of deportation or to appeal, because an informed exercise of those rights would have yielded him relief from deportation." *Id.* at 471. There is a seeming inconsistency in the court's formulation of the two parts of the test. Specifically, though the Court initially referred to the defendant's need to show foreclosure of "his right to *direct judicial review*," *id.* (emphasis added), in discussing the need to show prejudice, it referred to the failure to inform the deportee "of his rights to seek a suspension of deportation" – an administrative, not a judicial remedy. And later, in discussing the prejudice issue, the court referred to the defendant's eligibility for suspension of deportation under 8 U.S.C. §1254(a)(1), or for registration as a permanent resident under 8 U.S.C. §1182(a)(2) & (c), both of which are administrative, not judicial remedies (8 U.S.C. §1182(c) is the selfsame §212(c) upon which Adame-Salgado relies in this case). *Id.* at 472. The references to administrative remedies, however, are *dictum,* for the defendant in *Espinoza-Farlo* had not argued that he was prejudiced. *Id.* at 471.

In any event, *Espinoza-Farlo* wrote on the same backdrop as *Mendoza-Lopez* – a statute (§1326) that on its face did not allow for collateral challenge to the underlying deportation order.

7

It was this gap that led the Court in *Mendoza-Lopez* to establish its own test for such a challenge. But in 1996, two years after *Espinoza-Farlo* was decided, Congress amended §1326 to add a provision implicitly permitting such collateral challenges but setting limits on them. Section 1326(d) provides that an alien charged with an offense under §1326 may not challenge the validity of the underlying deportation order unless he shows that he exhausted available administrative remedies, the deportation proceedings improperly deprived him of the opportunity for judicial review, and entry of the deportation order was fundamentally unfair. 8 U.S.C. §1326(d). In other words, the statute, as amended, allows collateral attack only if the defects in the deportation proceedings effectively deprived the deportee of *judicial review*, not administrative relief.

With this background in mind, we turn to the issues raised by Adame-Salgado. If Adame-Salgado's challenge is limited by the parameters of §1326(d), he is not entitled to dismissal of the indictment. Section 1326(d), as we have indicated, limits collateral attacks on deportation orders to defects that deprive the alien-deportee of the opportunity for *judicial review*. Adame-Salgado was told that he had the right to seek review in the court of appeals, though the immigration judge misnamed that court as the "Southern Circuit."[2] But assuming for purposes of discussion that the judge's mistake was an error of sufficient gravity to deprive Adame-Salgado of the right of judicial review, the error did not render the proceedings "fundamentally unfair," as required to sustain a challenge under §1326(d). This Court believes that the phrase "fundamentally unfair," as used in §1326(d), should be defined in the same way in

---

[2] It is conceivable that the immigration judge actually said "Seventh Circuit," but the government has not challenged the accuracy of the transcript, so we take it as accurate for purposes of the present motion.

8

which the Seventh Circuit defined the term in *Espinoza-Farlo*: as requiring a showing that the defendant "was prejudiced by the Immigration Judge's failure to inform him of his rights ..., because an informed exercise of those rights would have yielded him relief from deportation." *Espinoza-Farlo,* 34 F.3d at 471. In Adame-Salgado's case, however, it is undisputed that an order of deportation was mandatory in light of his criminal convictions and the other facts noted by the immigration judge at the hearing. Thus direct judicial review of the merits of the deportation would not have helped Adame-Salgado in the least, and conversely, he was not prejudiced by any deficiency in the immigration judge's advice about his direct appeal rights.

Though Adame-Salgado could also have challenged on direct review other alleged errors in the deportation hearing, he points to just one: the fact that he was not represented by counsel. But this likewise would not have led to reversal of the deportation order. It is well established that a person facing deportation has only a right to obtain counsel at his own expense. *See Ambati v. Reno,* 233 F.2d 1054, 1061 (7th Cir. 2000). Adame-Salgado was specifically advised of that right by the immigration judge, and he was in no way deprived of it. The judge continued the hearing once to give Adame-Salgado the opportunity to bring in his attorney, and on the second date, Adame-Salgado, though without counsel, said that he was prepared to speak for himself.[3]

Adame-Salgado was not told that he had a right to petition for habeas corpus in the district court. But at the time of his hearing, the law appeared to provide that the right of an alien (like Adame-Salgado) who was being deported for aggravated felonies had no right to petition

---

[3] There is no evidence that Adame-Salgado had any difficulty understanding the proceedings.

for habeas corpus, or indeed to challenge his deportation in any court. Congress had appeared to eliminate that right in 1996 as part of the Antiterrorism and Effective Death Penalty Act and the Illegal Immigration Reform and Immigrant Responsibility Act. Among other things, 8 U.S.C. §1252(a)(2)(C), enacted as part of IIRIRA, provided that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" an aggravated felony or certain other types of offenses. *See generally Immigration and Naturalization Service v. St. Cyr,* 533 U.S. 289, 121 S. Ct. 2271 (2001) (discussing the import of 8 U.S.C. §§1252(a)(2), 1252(a)(2)(C), and 1252(b)(9), and AEDPA §401(e), 110 Stat. 1268 (1996)). This presumably explains the immigration judge's failure to advise Adame-Salgado about habeas corpus (though it does not explain why the judge advised him of the equally-apparently-defunct possibility of a challenge to the court of appeals).

In *St. Cyr,* the Supreme Court held that IIRIRA in fact did not eliminate the right of a deportee to file a habeas corpus petition. *Id.* at 2287. The government argues that this decision does not apply retroactively to Adame-Salgado, whose deportation proceeding had concluded five years earlier. It relies on *Harper v. Virginia Department of Taxation,* 509 U.S. 86, 97 (1993), which holds that a rule of federal law declared by the Supreme Court "must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." The Court doubts that *Harper* bars retroactive application of *St. Cyr,* as that case did not announce a new rule of federal law, but rather simply interpreted a statute. A court's interpretation of a statute may be applied retroactively. *See Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 312-13 (1994) ("[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as

after the decision in the case giving rise to the construction").[4] But even if the government's no-retroactive-application argument were correct, acceptance of that argument would not actually help the government's cause in this case. The upshot of the argument is that Adame-Salgado would have had *no* right to judicial review of his deportation. But *Mendoza-Lopez* effectively holds that an unreviewable administrative order may not be used as the predicate for a criminal conviction: "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding." *Mendoza-Lopez,* 481 U.S. at 838 (emphasis in original). Thus if there was really no right of judicial review at the time of Adame-Salgado's deportation, *Mendoza-Lopez* entitles him to challenge the deportation collaterally in this case, and the absence of judicial review takes us directly to the issue of prejudice. *See United States v. Gonzalez-Roque,* 165 F. Supp. 2d 577, 584 (S.D.N.Y. 2001) (IIRIRA, as interpreted at the time, deprived alien of right of judicial review of deportation proceedings); *United States v. Diaz-Nin,* No. CR 2000-746, 2002 WL 334918, at *3 (D.V.I. Feb. 21, 2002) (same)

For these reasons, we examine whether the failure to advise Adame-Salgado about the possibility of a petition for habeas corpus prejudiced him. It did not. Success on a petition for habeas corpus would have depended on Adame-Salgado's ability to show that he was being held in violation of the Constitution or laws of the United States. *See* 28 U.S.C. §2241. But the only such defect identified by Adame-Salgado concerns the absence of counsel, which, as we have

---

[4] In any event, even before *St. Cyr,* there was some authority supporting the proposition that a deportee retained the right to petition for a writ of habeas corpus. *See, e.g., LaGuerre v. Reno,* 164 F.3d 1035, 1040 (7th Cir. 1998) (holding that an alien challenging his deportation based on a constitutional violation could obtain review in the Court of Appeals and could also, in limited circumstances, pursue habeas corpus relief in the District Court).

noted, did not involve any violation of his rights. Adame-Salgado identifies no other defect that he could have or would have challenged if he had been aware of his right to petition for a writ of habeas corpus.

In sum, Adame-Salgado was not prejudiced by the immigration judge's claimed failure to properly advise him of the opportunities for judicial review. For these reasons, the alleged impairment of his judicial review rights did not render the deportation proceeding fundamentally unfair as §1326(d) defines that term. He is therefore unable to satisfy §1326(d)'s criteria for attacking his deportation order.

We cannot stop there, however, for Adame-Salgado's primary argument is that the deportation proceedings were fundamentally unfair as a result of the immigration judge's failure to advise him of his right to petition for relief from deportation under §212(c) and thus cannot be used as the predicate for a §1326 prosecution. Section 212(c) is not a form of judicial review, and thus the judge's failure to tell Adame-Salgado about it does not give rise to a challenge that §1326(d) allows. For this reason, the question, similar to the one addressed by the Supreme Court in *Mendoza-Lopez,* is whether due process requires allowing Adame-Salgado to collaterally attack the deportation on this basis.

Before addressing this question we pause to examine the nature and applicability of §212(c) relief and to review the evidence presented at the hearing held before the Court. As originally enacted, §212(c) provided that aliens lawfully admitted for permanent residence who voluntarily went abroad temporarily, and who were returning to a lawful unrelinquished domicile of seven consecutive years, could be admitted to the country in the discretion of the Attorney General. Though the statute was literally applicable only to proceedings to exclude aliens, and

not to deportation proceedings, the BIA had construed it to apply in the deportation context as well. *See St. Cyr,* 121 S. Ct. at 2276. As the Supreme Court indicated in *St. Cyr,* the extension of §212(c) to deportation proceedings "had great practical importance," and thousands of deportable aliens were granted relief under its provisions. *Id.* at 2276-77.

In 1990, Congress amended §212(c) to preclude from relief persons convicted of an aggravated felony who had served at least five years in prison. This would not have barred a §212(c) application by Adame-Salgado, who had served just slightly over two years in prison at the time of his deportation hearing. But by the time of that hearing, §212(c) had been eliminated from the law as part of IIRIRA and replaced with a narrower provision giving the Attorney General the authority to cancel the deportation of a narrower class of deportable aliens, not including those convicted of aggravated felonies. *See* IIRIRA §304(b), 110 Stat. 3009-597 (repeal of §212(c)); 8 U.S.C. §1229b. In *St. Cyr,* however, the Supreme Court held that the repeal of §212(c) did not apply retrospectively to aliens, like Adame-Salgado, whose aggravated felony convictions resulted from guilty pleas made at a time when the opportunity for §212(c) relief still existed. *St. Cyr,* 121 S. Ct. at 2293.

At the time of Adame-Salgado's hearing, there was no administrative regulation or statutory provision in place that told the immigration judge to advise a deportee about the possibility of applying for §212(c) relief. (Indeed, it does not appear that applicable regulations required immigration judges to advise deportees of the possibility of a §212(c) petition even before IIRIRA eliminated the statute. *See* 8 C.F.R. §242.17(a) (1994)) Regulations in effect at the time did require immigration judges to advise deportees of certain other forms of administrative relief, *see* 8 C.F.R. §242.17(a) (1997); 8 C.F.R. §240.11(a)(1) (1998), but none of

13

the types of relief referenced in those regulations – suspension of deportation under 8 U.S.C. §1254(a), adjustment of status under *id.* §1255, or creation of a record of lawful admission for permanent residence under *id.* §1259 – would have helped Adame-Salgado. The only referenced form of relief that involved canceling a deportation, namely suspension of deportation under §1254(a), applied to an alien deported for an aggravated felony only if the alien had been in the United States for ten or more years *after* the event giving rise to the deportation, which was not the case for Adame-Salgado. *See* 8 U.S.C. §1254(a)(2). And *St. Cyr,* of course, was a long way in the future at the time of Adame-Salgado's hearing; for this reason, the government again argues that *St. Cyr's* holding that §212(c) was still available to persons like Adame-Salgado cannot be applied retroactively to assist him in this case. For purposes of discussion, however, the Court will assume that Adame-Salgado could have petitioned for §212(c) relief in 1997 and was entitled to be advised of this by the immigration judge.

The Court held a hearing that was focused on the chances that Adame-Salgado would have been granted relief from deportation under §212(c) if he had made an application for such relief and it had been considered on the merits. Each side submitted a report from an expert in immigration law, and the Court heard testimony from both experts. Defendant's expert, Mary Sfasciotti, is a former Assistant United States Attorney and an experienced immigration lawyer in private practice. She has handled nearly two dozen §212(c) cases and has represented hundreds of deportees. The government's expert, John Hurlbut, is a former Special Assistant United States Attorney, a former trial attorney and INS Deputy District Counsel, and an experienced immigration lawyer in private practice, though he has never handled a §212(c) petition on behalf of a deportee.

Both witnesses testified that §212(c) petitions are determined based on the immigration judge's consideration and balancing of a number of factors, some of them subjective, and that the burden of proving entitlement to relief is on the alien. *See In re Marin,* 16 I. & N. Dec. 581 (BIA 1978). Hurlbut said that it was impossible to predict to any reasonable degree of certainty whether any particular person would obtain §212(c) relief, and that an applicant like Adame-Salgado who had committed a significant crime like attempted murder would have a more difficult time persuading an immigration judge to grant relief than a similarly-situated person who had committed a less serious crime. He also noted that an applicant with a history of disciplinary problems in prison – like Adame-Salgado – would have a difficult time showing rehabilitation, which Hurlbut said is a significant factor considered by immigration judges in determining whether to grant §212(c) relief. When given a hypothetical question involving an applicant similar to Adame-Salgado, Hurlbut said that such a person would have a "significant uphill battle" and would fall at the low end of the spectrum of likelihood of obtaining relief, but that the applicant would still have a chance for relief from "a sympathetic judge." He conceded that it was impossible to say to any reasonable degree of certainty that the petition of such an individual would fail.

Sfasciotti discounted the significance of Adame-Salgado's prison disciplinary record, stating that in her experience it would be unlikely that the INS lawyer opposing a §212(c) petition would request or obtain the applicant's prison records. She opined that a skilled lawyer could put together a persuasive case for relief on Adame-Salgado's behalf, emphasizing the fact that he came to this country at age one as the son of illegal aliens who later obtained amnesty and was educated here; virtually his entire family resides in this country; and his offenses were

committed when he was quite young and around the time that his parents broke up. She conceded that Adame-Salgado also had family in Mexico and had obtained work there following his deportation, but she felt that these ties were minimal compared to his ties in the United States and would not tilt the balance against granting relief. Sfasciotti concluded that Adame-Salgado would have had a reasonable chance of success had he filed a §212(c) petition; she stated that she had won relief for individuals with fewer mitigating factors.

Sfasciotti at times acted more as an advocate than a neutral expert, but given her occupation that is not particularly surprising, and the Court did not find that this undermined the veracity of her conclusions. We were not particularly impressed by two other aspects of Sfasciotti's testimony: the suggestion that an applicant could be "dressed-up" for a hearing by involving him in community activities and that an immigration judge would be unlikely to see through this, and her rather speculative hypothesis that a psychologist could develop testimony that would assist in Adame-Salgado's application. But even after discounting Sfasciotti's testimony in this regard, the Court found it persuasive. The mitigating factors noted by Sfasciotti -- primarily the fact that he had lived in the United States since he was a toddler, nearly his entire family was here, and his offenses were committed at a young age – put Adame-Salgado in a relatively favorable position in seeking §212(c) relief. His underlying offenses were no doubt serious, but all aggravated felony deportees who petition for such relief have committed serious felony offenses, yet according to the Supreme Court a "substantial percentage" of such applications have been granted. *See St. Cyr*, 121 S. Ct. at 2276-77. The Court finds that Adame-Salgado would have stood a reasonable chance of obtaining §212(c) relief if his application had been considered on its merits.

We therefore return to the question noted earlier: whether *Mendoza-Lopez* or principles of due process require permitting a person charged under §1326 to attack the predicate deportation order collaterally based on the immigration judge's failure to advise him of his right to petition for §212(c) relief. In *Mendoza-Lopez,* the Court noted that the immigration judge had failed to advise the aliens of their "eligibility to apply for suspension of deportation." *Mendoza-Lopez,* 481 U.S. at 840. But the Court did not rely on that fact in concluding that the aliens in that case had been prejudiced (an issue that was not a matter of dispute in any event, *see id.*); rather it held that "[b]ecause the waivers of their rights to appeal were not considered or intelligent, respondents were deprived of *judicial review* of their deportation proceeding." *Id.* (emphasis added). It is clear that it was the absence of judicial review, not administrative relief, that rendered infirm the indictments in *Mendoza-Lopez*. Nor is *Espinoza-Falco* determinative of this point, as we have previously discussed.

Some courts, primarily the Ninth Circuit, have concluded that an immigration judge's failure to advise an alien of his right to seek administrative relief from deportation constitutes a denial of due process that invalidates the deportation proceeding and renders it an improper predicate for a §1326 prosecution, at least so long as the alien had a reasonable possibility of obtaining relief. *See, e.g., United States v. Arrieta,* 224 F.3d 1076, 1079 (9th Cir. 2000); *United States v. Arce-Hernandez,* 163 F.3d 559, 563-64 (9th Cir. 1998); *United States v. Aguirre-Tello,* 181 F. Supp. 2d 1298, 1302 (D.N.M. 2002); *Diaz-Nin,* 2002 WL 334918, at *4-5 (deportation of alien whose request for relief under §212(c) was improperly dismissed could not be used as predicate for §1326 prosecution). The First Circuit and at least one other court have reached the opposite conclusion. *United States v. Vieria-Candelario,* 6 F.3d 12, 15 (1st Cir. 1993); *United*

*States v. Suazo-Martinez,* No. CRIM. DKC 2000-0371, 2000 WL 1876591, at *4 (D. Md. Dec. 20, 2000).

This Court believes that the First Circuit has the better of the dispute. In permitting collateral attacks on deportation orders, *Mendoza-Lopez,* as we have noted, relied on a series of decisions that required some form of *judicial* review before an administrative determination could be used as the basis for a later criminal sanction. *Mendoza-Lopez,* 481 U.S. at 838. There is no support in the Supreme Court's cases for the proposition that an administrative agency's failure to tell an individual about the possibility of administrative relief – or indeed, the unavailability of administrative relief to begin with – leads to a similar conclusion. The primary decision upon which the Court relied in *Mendoza-Lopez* – *Estep v. United States,* 327 U.S. 114 (1946) – was predicated on the Court's unwillingness to accept the proposition that "Congress intended that criminal sanctions were to be applied to orders issued by [administrative agencies] no matter how flagrantly they violated the rules and regulations which define their jurisdiction." *Id.* at 121. That principle, and the Court's formulation of the applicable rule in *Mendoza-Lopez,* indicates that its willingness to permit collateral attacks of administrative orders is limited to those which were not reviewed, or were not reviewable, *in the courts* for compliance with the governing standards as well as constitutional requirements. By contrast, an alien's ability to obtain §212(c) relief was a matter of sovereign grace – the rough equivalent of an executive pardon of a person convicted of a crime – not a matter of right.

For these reasons, the Court concludes that the immigration judge's failure to advise Adame-Salgado of the possibility of a §212(c) application did not deprive Adame-Salgado of any right of judicial review or of due process, and it does not preclude the use of his deportation as

18

the basis for the §1326 charge.

**Conclusion**

For the foregoing reasons, the Court denies defendant's motion to dismiss the indictment.

                                                                    _____
                                                                    MATTHEW F. KENNELLY
                                                                    United States District Judge

Date:   July 22, 2002